IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN AND SHIRLEY KULCHINSKY | : | CIVIL ACTION |
| | : | NO. 11-0319 |
| v. | : | |
| | : | |
| AMERIPRISE FINANCIAL | : | |
| | : | |
| O'NEILL, J. | : | JULY 13, 2011 |

MEMORANDUM

Plaintiffs Steven and Shirley Kulchinsky seek a Court Order vacating or modifying the decision of a panel of FINRA[1] arbitrators.  They argue that the panel incorrectly declined to award attorney's fees in their favor.  Defendant Ameriprise argues that for several reasons the panel did not err in refusing to award attorney's fees.  Ameriprise thus seeks confirmation of the arbitration award.  For the following reasons, I will deny the Kulchinskys' motion to vacate and grant Ameriprise's motion to confirm.

BACKGROUND

Ameriprise[2] is a financial planning firm.  It employed investment broker Jeffery Southard from September 1997 until September 2003.  During the time period relevant to this case, Southard lived and worked in New Jersey.

The Kulchinskys–also New Jersey residents–were two of Southard's clients.  In May 2002, Southard began advertising what he called "Ohio Bonds."  He told potential investors that the bonds would yield tax free monthly interest at a rate of six percent.  The bonds, which he

---

[1]    FINRA is an acronym for the Financial Industry Regulatory Authority.

[2]    Prior to 2005, Ameriprise was known as American Express Financial Advisors. Several of the exhibits refer to it by its former acronym "AEFA."  For the sake of clarity, I will refer to the company as Ameriprise throughout this opinion.

allegedly sold primarily to elderly investors, were later revealed to be fraudulent.  Southard was actually running a ponzi scheme.  The facts relevant to the Kulchinskys' claims in the present case are set forth below.

On September 24, 1997, Ameriprise entered into a franchise agreement with Southard which classified Southard as an independent contractor.  On October 22, 2002, the Kulchinskys made their initial investment into Southard's Ohio Bonds in the amount of $77,039.26.  Less than one month later, on November 19, 2002, the Kulchinskys invested another $10,000.  Both checks were made payable to JDBAC Financial Services–a company that Southard purported to own and operate.

At some point during the summer of 2003, Ameriprise became concerned that Southard was violating company policy.  On July 3, 2003, Christopher E. Mlynarczyk, Ameriprise's Manager of Field Compliance, interviewed Southard at his home office.  Mlynarczyk determined that Southard had acted improperly in at least four ways and thus recommended that Southard be terminated for cause immediately.  Mylnarczyk's interview notes indicate that he discussed the Ohio Bonds with Southard but that Southard was unable to produce any documentation to verify their legitimacy.  See Email from Mlynarczyk to Carol Rostad, et al. (July 3, 2003 5:11 pm) (Pl.'s Ex. E).[3]  Mlynarczyk ordered Southard to produce the necessary documentation by July 7, 2003.  Id.

On July 11, 2003, Donald Weaver, Ameriprise's Group Vice President, wrote in a letter to Southard:

_____

[3]       The plaintiff's exhibits that are designated with numbers were submitted in the underlying arbitration.  Those exhibits that are designated with letters were appended to the complaint filed in this Court.

2

> Jeffrey:
>
> You recently admitted in an interview with FCM Chris Mlynarczyk, American Express Senior Special Agent John Golbreski, and Registered Principal Scott Safford that you had gifted $10,000 to [an unnamed client]; placed client funds into the checking account of JDBAC Financial Services, Inc.; sold AEFA clients' investments in Ohio notes; and failed to disclose on your Outside Activities Disclosure form that you had sold non-AEFA investments to clients. This is in violation of company policy.
>
> . . . .
>
> Pursuant to Section 16 of the Franchise Agreement, "Special Regulatory Supervision," AEFA has the right to suspend an Independent Financial Advisor's rights to operate the Independent Financial Advisor Business and restrict the advisor from offering products and services. This is to inform you that effective July 11, 2003, you are hereby suspended from AEFA.
>
> . . . .
>
> If our investigation confirms that you are in default under the Franchise Agreement, this letter will constitute notice of that default.

Letter from Weaver to Southard (July 11, 2003) (Pl.'s Ex. F).  Ameriprise did not, however, attempt to advise Southard's clients of his suspension and departure from the firm.  See State of New Jersey Bureau of Securities, Summary Order of Revocation and Assessment of Penalties ¶ 20 (Nov. 25, 2008) (Pl.'s Ex. 1175).

Southard's suspension led him to file suit against Ameriprise.  On July 17, 2003, counsel for Ameriprise wrote to Southard's attorney to express Ameriprise's concern "that [Southard] has breached his fiduciary obligations to both AEFA and to its clients."  See Letter from John P. Lacey, Esq., counsel to Ameriprise, to Kevin D. Sheehan, Esq., counsel to Southard (July 17, 2003) (Pl.'s Ex. G).  In the letter, Ameriprise's counsel further asserted that "it appears that

3

[Southard] may have defrauded several individuals, and that such fraud may be continuing." Id.

The parties settled the lawsuit on September 16, 2003. The settlement agreement provided that "neither Party acknowledges or makes any admission of liability herein." See Settlement Agreement between Ameriprise and Southard (Sep. 16, 2003) (Pl.'s Ex. H). It further provided that "AEFA will report to [FINRA] under the category of 'Other' that Mr. Southard 'voluntarily resigned after he was suspended based on suspected dealing in unregistered and unreported securities and in commingling personal funds with client funds in violation of his franchise agreement. Mr. Southard denies that he violated the franchise agreement.'" Id.

On September 26, 2003, the Kulchinskys invested $184,123.32 into Southard's Ohio Bonds. The check was signed by Shirley Kulchinsky and made payable to JDBAC Financial Services.

FINRA requires its member organizations to file a "Form U5" whenever a registered representative of the company is terminated. Question 7B on the Form U5 asked: "[c]urrently is, or at termination was, the individual under internal review for fraud or wrongful taking or property, or violating investment-related statutes, regulations, rules or industry standards of conduct?" FINRA, Form U5 (Pl.'s Ex. I) (emphasis in original). Ameriprise answered "yes." As a result, it was obligated to provide "complete details of all events or proceedings on appropriate [forms]." See id. at 1. Ameriprise explained that: "[Southard] terminated his franchise agreement after he was suspended based on the appearance that he had offered unregistered securities to customers, settled in the field and commingled personal funds with client funds in violation of his franchise agreement and company compliance policies. Southard denies such violations." Id. at 4.

4

Question 7F on the Form U5 asked:

> [d]id the individual voluntarily <u>resign</u> from your firm, or was the individual discharged or permitted to <u>resign</u> from your firm, after allegations were made that accused the individual of:
> 1. violating <u>investment-related</u> statutes, regulations, rules or industry standards of conduct?
> 2. fraud or wrongful taking of property?
> 3. failure to supervise in connection with <u>investment-related</u> statutes, regulations, rules or industry standards of conduct?

FINRA, Form U5 at 3 (Pl.'s Ex. I) (emphasis in original). Ameriprise answered "no" to all three questions. Ameriprise never publicly disclosed the existence of the settlement agreement. Nor did it inform FINRA that it suspected that the Ohio Bonds were not valid instruments.

On August 7, 2003, FINRA, after receiving notification of Southard's termination, requested from Ameriprise "a brief written explanation, including all pertinent dates, of the circumstances surrounding [Southard's termination]." <u>See</u> Letter from Debrah S. Winterstein, FINRA, to Beth E. Weimer, Ameriprise (Aug. 7, 2003) (Pl.'s Ex. 0145). Carol Rostad, a member of Ameriprise's compliance department responded on August 19, 2003:

> Mr. Southard was suspended on July 11, 2003 for his involvement in selling non-AEFA investments. He admitted to selling three AEFA clients Ohio Notes. We asked Mr. Southard to provide us with documentation on the Ohio Notes, but he has not provided us with anything that would suggest these are legitimate notes. We are still in the process of conducting our investigation.

<u>See</u> Letter from Rostad to Winterstein (Aug. 19, 2003) (Pl.'s Ex. 0146).

On October 17, 2003, FINRA sought more information from Ameriprise with respect to Southard's sale of Ohio Notes. <u>See</u> Letter from Karen A. Tustin, FINRA Senior Compliance Examiner, to Rostad (Oct. 17, 2003) (Pl.'s Ex. 0147). On November 6, 2003, Ameriprise

provided the additional information requested by FINRA.  See Letter from Rostad to Tustin (Nov. 6, 2003) (Pl.'s Ex. 0152).

In late 2003, Southard applied for a position at GunnAllen Financial.  Before hiring Southard, however, FINRA regulations required GunnAllen to confirm certain facts about Southard's employment history.  Accordingly, GunnAllen wrote to Ameriprise to ask, in relevant part, whether Southard's termination had been voluntary.  Letter from Bradley A. Fay, GunnAllen Financial, to Ameriprise Human Resources Department (Sep. 13, 2003) (Pl.'s Ex. J). Ameriprise verified that Southard's termination had indeed been voluntary.  See id.  The same letter asked whether Ameriprise had "any additional relevant information regarding this applicant[.]"  Id.  Ameriprise declined to provide any additional information.  Id.  It did not inform GunnAllen of Mlynarczyk's investigative findings.

GunnAllen hired Southard on December 8, 2003 as an independent contractor. See GunnAllen Financial, Inc. and Independent Broker Network (IBN) Independent Registered Representative Agreement (Dec. 8, 2003) (Pl.'S Ex. 0133).  Over the course of the following year, Southard sought registration with the State of Florida's Office of Financial Regulation as an "associated person" with GunnAllen.  See Letter from David Tucker, Financial Analyst with the Florida Office of Financial Regulation, to Southard (Nov. 22, 2004) (Pl.'s Ex. 0153).  The Office of Financial Regulation requested from Southard "all documents pertaining to disciplinary matters whether disclosable on the U-4 or not."  Id.  Specifically, the Office requested a copy of the Form U5 and a statement from Southard describing "all customer complaints filed against him, whether disclosable on the Form U-4 or not . . . ."  Id.  Southard responded on December 10, 2004.  See Letter from Southard to Tucker (Dec. 10, 2004) (Pl.'s Ex. 0156).  In that letter,

6

Southard explained each of the customer complaints set forth in the Form U4 and the Form U5. Id. He also described the circumstances of his resignation from Ameriprise. Id.

The Office also requested from Ameriprise "records and supporting documentation of all client complaints" pertaining to Southard. Letter from Erik D. Kos, Ameriprise's Compliance Dept., to Jeffrey W. Groom, Florida Office of Financial Regulation (June 21, 2005) (Pl.'s Ex. 0169). In response, Ameriprise's compliance department identified seven customer complaints that had been filed against Southard during his tenure with the firm. Id. It also provided copies of all documents relevant to those customer complaints. Id. The Office ultimately approved Southard's application. See Letter from Richard A. White, director of the Florida Office of Financial Regulation, to Southard (July 15, 2005) (Pl.'s Ex. 0168).

While plaintiff was seeking registration with Florida's Office of Financial Regulation, the Kulchinskys made one withdrawal from their account and their fourth and fifth investments in the Ohio Bonds. On January 27, 2004, they withdrew $165,000. On March 26, 2004 they invested $5,000 and on September 22, 2004 they invested $98,903.78. Both checks were made payable to JDBAC. On October 27, 2005, after moving to Florida, the Kulchinskys made their sixth and final investment in Southard's Ohio Bonds in the amount of $30,000. They again made their check payable to JDBAC.

In total, the Kulchinskys invested $405,066.36 in Southard's Ohio Bonds. After subtracting the $165,000 that they withdrew in January 2004, the Kulchinskys allege that they lost $240,066.36. The Kulchinskys also assert that they lost an additional $31,950.87 by reinvesting their dividend payments.

On July 8, 2008, GunnAllen discharged plaintiff after he admitted that the Internal

7

Revenue Service had initiated a criminal investigation against him and that he had borrowed

client funds.  On June 12, 2009, Southard pled guilty in United States District Court for the

District of New Jersey to one count of mail fraud and one count of filing a false tax return.  On

November 20, 2009, Southard was sentenced to ninety-seven months imprisonment to be

followed by thirty-six months of supervised release.  Later in the same year, Southard pled guilty

in New Jersey Superior Court of one count of money laundering and one count of securities

fraud.  The Superior Court sentenced him to fifteen years imprisonment to run concurrently to his

federal sentence.

On September 23, 2008, the individuals who had purchased the Ohio Bonds from

Southard, including the Kulchinskys, filed with FINRA an arbitration claim against Southard,

Ameriprise and GunnAllen.[4]  The Kulchinskys alleged that Ameriprise knew of Southard's fraud

but did not disclose it to regulators.  Accordingly, the Kulchinskys argued that Ameriprise was

liable to them for their losses under theories of: (1) breach of contract; (2) failure to supervise;

(3) breach of fiduciary duty; (4) misrepresentation and omission; (5) violation of the New Jersey

Uniform Securities law; (6) violation of the New Jersey Consumer Fraud Act; (7) negligence; (8)

fraud; (9) conversion; (10) aiding and abetting breach of fiduciary duty; (11) aiding and abetting

conversion; (12) aiding and abetting fraud; (13) promissory estoppel; (14) violation of the New

Jersey RICO Act; (15) violation of the Federal RICO Act; and (16) conspiracy.

The arbitration panel received forty-one days of testimony between October 5, 2009 and

---

[4]     The arbitration claimants filed an Amended Statement of Claim on April 17, 2009 and a Second Amended Statement of Claim on June 19, 2009.  There were, in total, sixteen claimants.

August 12, 2010.[5]  At the conclusion of the hearing, claimants requested, among other forms of

relief, attorney's fees and costs.  The panel ultimately held that "Ameriprise and GunnAllen are

jointly and severally liable for and shall pay to Steven and Shirley Kulchinsky compensatory

damages in the amount of $133,903.78."  See In the Matter of the Arbitration Between Capewell

et al. and Southard et al., Case No. 08-03468, Arbitration Award at p.5 (Oct. 22, 2010) (Pl.'s Ex.

B).  It further held that "Claimants' claims for punitive damages, RICO damages, disgorgement,

and attorneys' fees are denied in their entirety.  Any remaining claims of Claimants are denied in

their entirety as to Ameriprise and GunnAllen."  Id. at p. 6.  The panel also awarded $240,066.30

to the Kulchinskys with respect to their claims against Southard.  Id. at 7.  One arbitrator

dissented.

    The panel did not issue an opinion explaining its decision.  It also did not indicate in its

award which of claimants' case theories it found to be meritorious.

    The Kulchinskys disagreed with the panel's decision with respect to their application for

attorney's fees.  They accordingly wrote to FINRA and requested that the panel clarify whether it

had found Ameriprise liable under the Florida Securities Act and, if so, explain why it had

declined to award attorney's fees in their favor.  See Letter from E. McCord Clayton, counsel for

claimants, to Ms. Archna Curry, FINRA's Case Administrator (Nov. 11, 2010) (Pl.'s Ex. P).  In

FINRA's response letter, it advised the Kulchinskys that "pursuant to [the applicable arbitration

rule] the Director or Arbitration has determined that the submissions . . . do not comply with the

grounds enumerated in the rule."  See Letter from Curry to Clayton (Nov. 18, 2010) (Pl.'s Ex. R).

---

[5]    On April 26, 2010, GunnAllen filed for bankruptcy.  It did not appear in the
arbitration proceedings after April 1, 2010.

STANDARD OF REVIEW

The Federal Arbitration Act, 9 U.S.C. § 1 et seq., governs this case because it involves interstate commerce.[6]  See 9 U.S.C. § 2; Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005) ("This arbitrability dispute is connected with a transaction involving interstate commerce, and is therefore governed by the Federal Arbitration Act[.]").  "There is a strong presumption under the Federal Arbitration Act . . . in favor of enforcing arbitration awards." See Brentwood Med. Assocs. v. United Mine Workers of Am., 396 F.3d 237, 241 (3d Cir. 2005) (internal citation omitted).  Review of an arbitration award is therefore "extremely deferential." See Metromedia Energy, Inc. v. Enserch Energy Servs., Inc., 409 F.3d 574, 578 (3d Cir. 2005), citing Dluhos v. Strasberg, 321 F.3d 365, 370 (3d Cir. 2005).  The Court of Appeals has held that "an award is presumed valid unless it is affirmatively shown to be otherwise, and the validity of an award is subject to attack only on those grounds listed in 9 U.S.C. § 10, or if enforcement of the award is contrary to public policy.  See Brentwood Med. Assocs., 396 F.3d at 241, Exxon Shipping Co. v. Exxon Seaman's Union, 993 F.2d 357, 360 (3d Cir. 1993).

Section 10(a) of the FAA provides:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration-
>
> > (1) where the award was procured by corruption, fraud, or undue means;
> >
> > (2) where there was evident partiality or corruption in the arbitrators, or either of them;

---

[6]     The Kulchinskys argue that the Florida Arbitration Code is also applicable to this case.  See Kulchinskys' Br. at 17-18.  They do not, however, identify any substantive differences between the federal and state arbitration statutes.

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

In addition to the reasons set forth in section 10(a), the Court of Appeals has also approved of vacatur where "the arbitrator's decision evidences a manifest disregard for the law rather than an erroneous interpretation of the law." Dluhos, 321 F.3d at 370 (internal quotation marks and alterations omitted), citing Local 863 Int'l Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of Am. v. Jersey Coast Egg Producers, Inc., 773 F.2d 530, 534 (3d Cir. 1985). "[U]nless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§ 10-11]," the Court must grant a motion to confirm the award. 9 U.S.C. § 9.

## ANALYSIS

The question presented by this case is whether the arbitration panel's denial of the Kulchinskys' request for attorney's fees must be vacated or modified. The Kulchinskys assert that the Florida Securities Act, Fla. Stat. Ann. § 517.211, required the panel to award attorney's fees to them. They argue that I must vacate the panel's decision because: (1) the panel acted in manifest disregard of the law; (2) the award is contrary to public policy; and (3) "the arbitrators acted in violation of state and federal statutory standards governing the judicial award of arbitral awards . . . and the Florida Arbitration Code . . . ."[7] See Kulchinskys' Br. at 17 - 28.

---

[7]     In their complaint, the Kulchinskys also assert that I should vacate the award because it "does not meet the test of fundamental rationality." See Compl. ¶ 135. They did not, however, pursue this argument in their brief. I accordingly find that they have waived this

11

Alternatively, the Kulchinskys argue that I should remand the case to the panel for a further explanation of the decision.

Ameriprise suggests two possible interpretations of the panel's decision that would render defensible its decision with respect to attorney's fees.  First, Ameriprise argues that the panel did not award damages to the Kulchinskys under the FSA.  Second, it argues that even if the panel did award damages under the FSA, it must have found that an award of attorney's fees would be unjust.

I.      The Arbitration Panel Did Not Manifestly Disregard the Law

The Kulchinskys argue most forcefully that the panel's refusal to award attorney's fees in their favor was in manifest disregard of the law.  "The party seeking to vacate the award bears the burden of proving that vacatur is appropriate."  Popkave, 2011 WL 382713, at *4; see also Wall St. Assocs., L.P. v. Becker Paribas Inc., 27 F.3d 845, 848 (2d Cir. 1994) (By enumerating the grounds for vacating an arbitration award, and specifying that those grounds may be shown 'upon the application of any party,' Congress evidenced its intent that the party making the application should also bear the burden of proving the defect.").  The Court of Appeals has held that manifest disregard of the law by an arbitration panel provides a basis for the District Court to vacate the panel's decision.[8]  See Local 863 Intern. Bhd. of Teamsters, 773 F.2d at 533 ("An award may be

---

argument.  Even if I were to reach the merits of the "fundamental rationality" argument, I would find that for the reasons expressed herein the award is not fundamentally irrational.

[8]      The Supreme Court's decision in Hall St. Assocs., LLC v. Mattel, Inc., 552 U.S. 576, 581 (2008), calls into question the continuing validity of the manifest disregard of the law basis for vacatur.  The Courts of Appeals are presently divided on the issue.  Compare Comedy Club Inc. v. Improv W. Assocs., 553 F.3d 1277, 1290 (9th Cir. 2009) (holding that manifest disregard of the law survives the Court's ruling in Hall Street); Stolt-Nielsen SA v. AnimalFeeds Int'l Corp., 548 F.3d 85, 93-95 (2d Cir. 2008), overruled on other grounds, —U.S.—, 130 S. Ct.

set aside only in limited circumstances, for example, where the arbitrator's decision evidences

manifest disregard for the law rather than an erroneous interpretation of the law."). "The

'manifest disregard of the law' doctrine is a judicially-created one that is to be used 'only [in]

those exceedingly rare circumstances where some egregious impropriety on the part of the

arbitrators is apparent, but where none of the [vacatur] provisions of the [FAA] apply.'"  Black

Box Corp. v. Markham, 127 F. App'x 22, 25 (3d Cir. 2005) (alterations in original),

quoting Duferco Int'l Steel Trading v. T. Klavness Shipping A/S, 333 F.3d 383, 389 (2d Cir.

2003).

Courts have repeatedly held that manifest disregard of the law requires more than "mere

legal error or misunderstanding."  See Silicon Power Corp. v. Gen. Elec. Zenith Controls, Inc.,

661 F. Supp. 2d 524, 542 (E.D. Pa. 2009), citing Sherrock Bros., Inc. v. DaimlerChrysler Motors

Co., LLC, 260 F. App'x 497, 499 (3d Cir. 2008).  Even "gross error" by the panel is not enough

to require the Court to vacate the arbitration decision because Courts "do not sit to hear claims of

factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower

courts."  See Black Box Corp., 127 F. App'x at 26; McCarthy v. Citigroup Global Markets, Inc.,

463 F.3d 87, 93 (1st Cir. 2006).  Instead, "[m]anifest disregard of the law addresses itself to

_____

1758, 176 L. Ed. 2d 605 (2010) (same) with Frazier v. CitiFinancial Corp., LLC, 604 F.3d 1313,
1324 (11th Cir. 2010) (holding that manifest disregard of the law is no longer a basis to vacate an
arbitration decision following Hall Street Assocs.); Citigroup Global Markets v. Bacon, 562 F.3d
349, 357 (5th Cir. 2009) (same).  The Court of Appeals for the Third Circuit has not yet decided
the question.  See Paul Green Sch. of Rock Franchising, LLC v. Smith, 389 F. App'x 172, 175-
76 (3d Cir. 2010) ("This Court has not yet addressed whether manifest disregard of the law
remains a valid ground for vacating an arbitration award under the FAA, in the wake of the
Supreme Court's decision in [Hall Street]").  I need not decide the question here because, even
assuming that the manifest disregard of the law standard still applies, the Kulchinskys have not
demonstrated that the panel manifestly disregarded the law.

situations in which it is evident from the record that the arbitrator knew the applicable law, and yet chose to ignore it." Popkave v. John Hancock Distribs. LLC, — F. Supp. 2d —, 2011 WL 382713, at *3 (E.D. Pa. 2011), citing Aetna Cas. & Surety Co. v. Dravo Corp., No. 97-149, 1997 WL 560134, at *1 (E.D. Pa. Aug. 1, 1997). "If a court is to vacate an arbitration award on the basis of a manifest disregard of the law, there must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it." O.R. Secs., Inc. v. Prof'l Planning Assocs., Inc., 857 F.2d 742, 747 (11th Cir. 1988), cited favorably in Popkave, 2011 WL 382713, at *3. "The net result of a court's application of this standard is generally to affirm easily the arbitration award under this extremely deferential standard–a result that is squarely in line with the purpose behind the FAA where courts are tasked with reviewing an arbitration decision." Dluhos, 321 F.3d at 370.

Where an arbitration panel elects not to issue a written explanation of its decision, the party seeking vacatur on the ground that the panel manifestly disregarded the law faces an even higher burden. In such a case, "it is nearly impossible for the court to determine whether [the panel] acted in disregard of the law." O.R. Secs, Inc., 857 F.2d at 747; see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros, 70 F.3d 418, 421 (6th Cir. 1995) ("Where, as here, the arbitrators decline to explain their resolution of certain questions of law, a party seeking to have the award set aside faces a tremendous obstacle."). "In the end, as long as there is a 'barely colorable' justification for the arbitrators' decision, however, it is to be upheld." Popkave, 2011 WL 382713, at *3, citing Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 13 (2d Cir. 1997) ("If there is 'even a barely colorable justification for the outcome reached,' the court must confirm the arbitration award.").

14

Given the deferential standard of review, it is not surprising that there are very few cases in which Courts have found that an arbitration panel manifestly disregarded the law.  Montes v. Shearson Lehman Bros., Inc., 128 F.3d 1456 (11th Cir. 1997), however, is a representative decision.  There, the Court of Appeals for the Eleventh Circuit held that an arbitration panel had manifestly disregarded the law where there was evidence that defense counsel "flagrantly and blatantly" had urged the panel to do so.  See Montes, 128 F.3d at 1461.  In his closing argument, counsel had stated:

> You have to decide whether you're going to follow the statutes that have been presented to you, or whether you will do or want to do or should do what is right and just and equitable in this case. I know it's hard to have to say this and it's probably even harder to hear it but in this case this law is not right. Know that there is a difference between law and equity and I think, in my opinion, that difference is crystallized in this case. The law says one thing. What equity demands and requires and is saying is another. What is right and fair and proper in this? You know as arbitrators you have the ability, you're not strictly bound by case law and precedent. You have the ability to do what is right, what is fair and what is proper, and that's what Shearson is asking you to do.

Id. at 1459.  Nothing in the record or in the arbitrator's decision demonstrated that the arbitrators had declined "[to] heed this plea."  Id. at 1461.

The Kulchinskys argue that the panel manifestly disregarded the FSA's provision requiring an award of attorney's fees.  The FSA provides in relevant part:

> (1) It is unlawful and a violation of the provisions of this chapter for a person:
>
> > (a) In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061,

15

directly or indirectly:

>1. To employ any device, scheme, or artifice to defraud;

>2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

>3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

. . .

>(c) In any matter within the jurisdiction of the office, to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry.

Fla. Stat. Ann. § 517.301.  The statute further provides that "[i]n any action brought under this section, including an appeal, the court shall award reasonable attorneys' fees to the prevailing party unless the court finds that the award of such fees would be unjust."  Id. at § 517.211.

The Kulchinskys' argument is based on a series of inferences.  First, they argue that the only reasonable interpretation of the panel's award indicates that the panel found in their favor on their FSA claim.  Second, they argue that there is no evidence in the record from which the panel could have concluded that an award of attorney's fees would be unjust.  In light of these two inferences, the Kulchinskys argue that the panel's denial of their request for attorney's fees must have been based on its manifest disregard of the law.

I have examined the voluminous arbitration record provided by the Kulchinskys.  Even

assuming that the panel "fail[ed] . . . to understand or apply [the correct law]," there is no evidence that "the panel intentionally defied the law." STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, —F.3d—, 2011 WL 2151008, at *8 (2d Cir. 2011).  The Kulchinskys do not point to any evidence "other than the result obtained, that the arbitrators knew the law and expressly disregarded it." McCarthy, 463 F.3d at 95, citing Advest, Inc. v. McCarthy, 914 F.2d 6, 10 (1st Cir. 1990).

        There are instead at least two possible interpretations of the award that are not indicative of manifest disregard of the law.  First, it is possible that the panel simply applied the New Jersey Uniform Securities Act, which does not provide for an award of attorney's fees, Florczak v. United Jersey Bank, 591 A.2d 1023, 1023-24 (N.J. Super. Ct. 1991), to all of the Kulchinskys' claims.  In light of the evidence and legal arguments presented to the panel, such a decision was not evidence of the panel's manifest disregard of the law.  Five of the Kulchinskys' six securities transactions occurred while they and Southard lived in New Jersey.  Only the sixth transaction–representing approximately twelve percent of the Kulchinskys' total losses–occurred while they lived in Florida.  At that point, however, Southard still lived and worked in New Jersey.  As a factual matter, then, the panel might reasonably have concluded that New Jersey law applied to the Kulchinskys claims.

        More importantly, as a legal matter, review of the claimants' post-arbitration briefs reveals that they supported their securities act claims primarily by referencing New Jersey law. Indeed, they referred to the FSA only twice–first distinguishing the FSA from federal securities law insofar as the former applies even to non-existent securities such as the Ohio Bonds at issue, see Claimants' Post-Arbitration Br. at 44, and then later noting that "attorneys' fees also are

17

recoverable under the [FSA] applicable to the Kulchinskys' claims."[9]  Id. at 77.  The Kulchinskys

did not explain to the panel why they believed New Jersey law should apply to some of their

claims and Florida law to others.  Nor did they cite the language of the FSA which arguably

renders it applicable to the Kulchinskys' sixth transaction.  See Fla. Stat. Ann. § 517.301(c) ("In

any matter within the jurisdiction of the office . . . .").  The claimants' only acknowledgment of

the choice of law question is found in a footnote preceding their discussion entitled  "Violation of

the State Securities Laws."  See Claimants' Br. at 42.  In that footnote, they noted that

> Nina Belasco Craig asserts claims under the Pennsylvania Securities
> Act . . . and claimants Steven and Shirley Kulchinsky assert claims
> under the Florida Securities Act . . . .  Respondent GunnAllen may
> attempt to argue that New York law applies to the claims of certain
> Claimants.  Accordingly, and without taking any position on said
> choice-of-law issue, this Memorandum will also discuss New York
> law in parts.

See id. at 42 n.2 (internal quotations omitted).  As is apparent from the quoted passage, the

claimants chose to take no position on the choice of law question instead of providing the panel

with applicable legal principles.

"[T]he Court must impute to the arbitrators only knowledge of governing law identified

by the parties to the arbitration[.]"  Popkave, 2011 WL 382713, at *5, citing MetLife Sec., Inc. v.

Bedford, 456 F. Supp. 2d 468, 473 (S.D.N.Y. 2006).  Accordingly, because the panel received no

guidance from the Kulchinskys as to which claims the FSA applied,  I find that the panel's

apparent decision to apply the New Jersey Uniform Securities law to all of their claims was not

---

[9]  The claimants also cited two cases interpreting the FSA solely for the proposition
that the respondents had not proven any proper basis for apportionment.  See Claimants' Br. at
131-32, citing Twiss v. Kury, 25 F.3d 1551 (11th Cir. 1994) and Palmer v. Shearson Lehman
Hutton, Inc., 622 So. 2d 1085 (Fla. App. 1993).

evidence of manifest disregard of the law.[10]  See McCarthy, 463 F.3d at 94 ("Even where such error is painfully clear, courts are not authorized to reconsider the merits of arbitration awards.").

Second, even assuming that the panel was capable of determining to which claims the FSA should apply, the Kulchinskys did not inform the panel that the FSA required (as opposed to permitted) that attorney's fees be awarded to the prevailing party.  In their post-arbitration brief, the claimants provided six grounds upon which the panel could award attorney's fees. See Claimants' Post-Arbitration Br. at 76-81 (emphasis in original).  With respect to the FSA they stated simply: "[s]econd, attorneys' fees also are recoverable under the Florida Securities Act applicable to the Kulchinskys' claims."  See id. at 77 (emphasis in original).  Nothing in that sentence indicated to the panel that an award of attorney's fees was mandatory under the FSA.[11] In notable contrast, the claimants stated in the preceding paragraph: "[f]irst, awards of attorneys' fees to a prevailing party are *mandatory* under the New Jersey Consumer Fraud Act.  Again, this Panel does not have discretion simply to ignore the mandatory nature of these attorneys' fee awards."  Id. at 76 (internal citations omitted) (emphasis in original).  Then again, several paragraphs later, the claimants stated: "[f]ifth, an award of attorneys' fees to prevailing parties is

_____

[10]        For the same reason, I disagree with Ameriprise's argument that the panel declined to award attorney's fees to the Kulchinskys because to do so would have been unjust. Ameriprise did not make that argument in the arbitration.  Therefore, I assume that the panel was not aware that it could decline to award attorney's fees on that basis.

[11]        Nor have the Kulchinskys cited any other evidence in the record to establish that they informed the panel of the mandatory nature of the FSA's attorney's fees provision.  The party who moves for vacatur bears the burden of directing the Court to the evidence in the record that supports its argument.  Popkave, 2011 WL 382713, at *4.  I note that it is especially critical in a case like this one, where the record contains hundreds of pages of briefs, thousands of pages of transcripts and hundreds of unlabelled exhibits, that the party seeking vacatur cite to the record.

*mandatory* under the RICO statutes."[12]  Id. at 78 (emphasis in original).  Given that the claimants

pointedly identified the statutes under which they believed an award of attorney's fees was

mandatory, the panel was entitled to assume that those statutes not so identified permitted but did

not require it to award attorney's fees.  Because the claimants did not inform the panel that the

attorney's fees provision of the FSA was mandatory in nature, its decision not to award

fees under the statute was not manifest disregard of the law.   See Black Box Corp., 127 F. App'x

at 25 ("To the extent that the arbitration panel was not made aware of the governing law that

Black Box now argues is controlling in this matter, it is difficult to see how the panel refused to

apply or otherwise ignored this law.").

        To vacate the arbitration award on the basis of such a record would "frustrate[ ] the basic

purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of

extended court proceedings[.]"  STMicroelectronics, N.V., 2011 WL 2151008, at *8.  The parties

have bargained for and received the panel's factual findings and application of the law.  Because

I find that the panel did not manifestly disregard the law, I will deny the Kulchinskys' motion to

vacate the award.

---

[12]        Throughout their post-arbitration brief, the claimants utilized the same bold-faced, italicized font whenever they referred to damages to which they believed they were entitled.  For example, when discussing treble damages, the claimants wrote: "[t]reble damages awards to the prevailing plaintiff are *mandatory* under the New Jersey Consumer Fraud Act."  See Claimants' Br. at 69 (emphasis in original).  They also noted that "[t]he RICO statutes also require *mandatory* trebling of damages."  Id. (emphasis in original).
        In a footnote to their section on treble damages, the claimants further underscored the mandatory nature of the treble damages: "[t]his Panel does not have discretion simply to ignore the mandatory nature of these treble damages.  Rather, under both federal and state law, an arbitration panel's decision may be vacated for manifest disregard of the law."  As noted in the text, they included similar language with respect to their attorney's fees request pursuant to the New Jersey Consumer Fraud Act but not with respect to their request pursuant to the FSA.

II.     The Award Does Not Violate Public Policy

The Kulchinskys next argue that the panel's award violates public policy and therefore must be vacated.  They suggest that two public policies are at issue.  First, "that awards of attorney's fees are mandatory to prevailing parties in cases brought pursuant to the [FSA]."  Kulchinskys' Br. at 28.  Second, that the panel's refusal to award attorney's fees "undermines the public policy favoring arbitration of disputes, particularly in the field of securities law [because] [i]f review of arbitration awards by the federal courts is foreclosed, or if awards evincing manifest disregard for the law or fundamental irrationality are allowed to stand, public confidence in the fairness of FINRA arbitration procedures will be eroded."  Id.

The Court of Appeals has held that a Court may vacate an arbitration award where the award violates public policy.  See Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d 1287, 1291 (3d Cir. 1996).  "The Court has made clear that any such public policy must be explicit, well defined, and dominant.  It must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S.P.S., 272 F.3d 182, 185 (3d Cir. 2001), quoting E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000).

I find that the panel's refusal to award attorney's fees did not violate public policy.  The Court of Appeals for the Second Circuit's decision in DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 824 (2d Cir. 1997), is instructive.  DiRussa had been employed as a branch manager for Dean Witter Reynolds.  See DiRussa, 121 F.3d at 820.  At the age of 58, he was demoted to account executive.  Id.  In an arbitration before FINRA's predecessor organization, he argued that his demotion violated the federal Age Discrimination in Employment Act of 1967, 29

U.S.C. § 621, and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1.  Id.
DiRussa sought attorney's fees and costs in addition to compensatory damages.  Id.  The panel
awarded DiRussa $220,000 but denied his application for attorney's fees.  Id.  He accordingly
filed suit in District Court, arguing that the panel's denial of his attorney's fees application had
violated the ADEA's provision that "[t]he court . . . shall, in addition to any judgment awarded to
the plaintiff, . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the
action."  Id., citing 29 U.S.C. § 626(b), incorporating by reference 29 U.S.C. § 216(b).

    The DiRussa Court concluded that the panel's denial of DiRussa's application for
attorney's fees was not in manifest disregard of the law because "there was no persuasive
evidence that the arbitrators actually knew of–and intentionally disregarded–the mandatory
aspect of the ADEA's fee provision."[13]  Id. at 822.  The Court dedicated a somewhat lengthier
discussion, however, to DiRussa's claim that the panel's decision was contrary to public policy.
Id. at 824.  DiRussa had relied on substantially the same policy upon which the Kulchinskys rely.
Namely, that the fee shifting provision "encourages private litigants to pursue their rights."  Id. at
825.

    Although the Court agreed that the policy upon which DiRussa relied was important, it
began its analysis by comparing the policy at issue with policies that had previously been held
sufficient to vacate an arbitration award.  Id.  In one case, Newsday, Inc. v. Long Island
Typographical Union, 915 F.2d 840, 844 (2d Cir. 1990), the Court held that vacatur of an
arbitrator's award was appropriate where the arbitrators had ordered the reinstatement of an

---

    [13]    In this respect, the DiRussa Court's holding is identical to mine.  I adopt fully that
Court's analysis in support of my decision on the issue of whether the panel manifestly
disregarded the law.

employee whom the District Court had labeled a "chronic sexual harasser" because the employee had not been discharged for just cause.  Id.  The Court vacated the award because it violated "Title VII's strong prohibitions against sexual harassment in the workplace and 'perpetuate[d] a hostile, intimidating and offensive work environment.'"  Id., citing Newsday, Inc., 915 F.2d at 844-45.  In another case, Iowa Elec. Light & Power Co. v. Local Union 204, 834 F.2d 1424, 1425, 1428 (8th Cir. 1987), the Court of Appeals for the Eighth Circuit upheld the vacatur of an arbitration award that required the reinstatement of a nuclear power plant machinist "who had been discharged for intentionally violating important federally-mandated safety regulations." Iowa Elec. Light & Power Co., 834 F.2d at 1425.

Acknowledging that "[w]hether to vacate an arbitration award based on this type of broadly-stated public policy poses a difficult question," the DiRussa Court nevertheless concluded that Newsday, Inc. and Iowa Elec. Light & Power were distinguishable.  DiRussa, 121 F.3d at 825.  Unlike those cases, in which the arbitration panels had reinstated employees who had engaged in conduct that was "particularly harmful to society and egregious in nature," the arbitration panel in DiRussa had simply misinterpreted federal law.  Id.  To vacate the panel's decision on that basis would set a precedent that "arbitration awards violate public policy whenever an arbitrator erroneously interprets federal statutory law."  Id.  According to the Court, the Supreme Court had not intended "to invite this type of plenary review of arbitration awards when it held . . . that statutory claims pursuant to the ADEA were arbitrable."  Id.

The case law in this Circuit is consistent with the DiRussa Court's analysis and holding. For example, in Exxon Shipping Co., 993 F.2d at 362, the Court of Appeals affirmed the vacatur of an arbitration award that had reinstated a helmsman on an oil tanker who had tested positive

for marijuna.  The Court held that the arbitrators had ignored "a well defined and dominant public policy against the operation of [an oil tanker] under the influence of drugs or alcohol."  Id. (internal quotation marks omitted).  The Court again affirmed the District Court's vacatur on public policy grounds of an arbitration award reinstating a seaman on an oil tanker who was found to be intoxicated while on duty.  Exxon Shipping Co. v. Exxon Seamen's Union, 11 F.3d 1189, 1194 (3d Cir. 1993).  There, the Court found that the arbitrators had disregarded "a well defined and dominant public policy that an owner or operator of an oil tanker should not be compelled to reinstate to a safety-sensitive position an individual who has been found to be intoxicated while on duty on that vessel."  Exxon Shipping Co., 11 F.3d at 1194 (internal quotation marks omitted).

I have found no case in which a Court has vacated an arbitration award on the basis of the arbitrator's refusal to award attorney's fees in violation of a statutory provision.  As indicated above, the vast majority of cases in which an arbitration decision was vacated on public policy grounds involved public policies directly affecting public health and welfare.  I will not elevate the panel's arguable misapplication of Florida law to a violation of public policy.[14]  I will accordingly deny the Kulchinskys' motion to vacate on public policy grounds.

III.    FINRA's Refusal To Re-Submit the Matter to the Panel for Clarification Was Not Manifest Disregard of the Law

The Kulchinskys also argue that FINRA acted in manifest disregard of the law by declining their request to resubmit the matter to the panel for further clarification of its decision

---

[14]     This is especially true where the panel's arguable misapplication of Florida law was attributable to the fact that the claimants did not provide the panel with the applicable legal principles.

with respect to the FSA.[15]  Kulchinskys' Br. at 27.  In their letter requesting resubmission of the matter to the panel, the Kulchinskys relied on Fla. Stat. Ann. § 682.10 et seq. for the proposition that the matter could be resubmitted to the panel.  See Letter from Clayton to Curry (Nov. 11, 2010) (Pl.'s Ex. P).  Section 682.10 provides:

> On application of a party to the arbitration, or if an application to the court is pending under § 682.12, § 682.13 or § 682.14, on submission to the arbitrators, or to the umpire in the case of an umpire's award, by the court under such conditions as the court may order, the arbitrators or umpire may modify or correct the award upon the grounds stated in § 682.14(1)(a) and (c) or for the purpose of clarifying the award. The application shall be made within 20 days after delivery of the award to the applicant. Written notice thereof shall be given forthwith to the other party to the arbitration, stating that he or she must serve his or her objections thereto, if any, within 10 days from the notice. The award so modified or corrected is subject to the provisions of §§ 682.12-682.14.

The language of section 682.10 is permissive.  It does not require the panel to modify or correct an award.  FINRA has promulgated its own regulations with respect to when a panel will reconsider its award.  Section 12905 of the FINRA arbitration code provides:

> (a) Parties may not submit documents to arbitrator(s) in cases that have been closed except under the following limited circumstances:
>
> (1) as ordered by a court;
>
> (2) at the request of any party within 10 days of service of an award or notice that a matter has been closed, for typographical or computational errors, or mistakes in the description of any person or property referred to in the award; or
>
> (3) if all parties agree and submit documents within 10 days

---

[15]     I assume arguendo that manifest disregard of the law by FINRA (as opposed to by the panel) is sufficient to require that the award be vacated or that the case be remanded to the panel.

of (1) service of an award or (2) notice that a matter has been
closed.

The Kulchinskys' letter seeking clarification did not implicate any of the three limited grounds

for reconsideration.  I find accordingly that FINRA's decision not to resubmit the matter to the

panel was not in manifest disregard of the law.

IV.     Remand to the Arbitration Panel Would Be Inappropriate

        The Kulchinskys alternatively argue that I should remand the decision to the arbitration

panel for further explanation of the award.  "As a general rule, once an arbitration panel renders a

decision regarding the issues submitted, it becomes functus officio and lacks any power to

reexamine that decision."  Colonial Penn Ins. Co. v. Omaha Indem. Co., 943 F.2d 327, 331 (3d

Cir. 1991).  "The policy underlying this general rule is an 'unwillingness to permit one who is

not a judicial officer and who acts informally and sporadically, to re-examine a final decision

which he has already rendered, because of the potential evil of outside communication and

unilateral influence which might affect a new conclusion.'"  Id. at 331-32, quoting La Vale Plaza,

Inc. v. R.S. Noonan, Inc., 378 F.2d 569, 572 (3d Cir. 1967).

        There are, however, three exceptions to the general rule against remanding a decision to

an arbitration panel for further consideration: "(1) an arbitrator 'can correct a mistake which is

apparent on the face of his award;' (2) 'where the award does not adjudicate an issue which has

been submitted, then as to such issue the arbitrator has not exhausted his function and it remains

open to him for subsequent determination;' and (3) '[w]here the award, although seemingly

complete, leaves doubt whether the submission has been fully executed, an ambiguity arises

which the arbitrator is entitled to clarify.'"  See Int'l Union of Bricklayers and Allied

Craftworkers, Local 5 v. Inter-State Tile & Mantel Co., Inc., No. 1:07-1150, 2010 WL 2034693, at *9 (M.D. Pa. Mar. 18, 2010), quoting Colonial Penn Ins. Co., 943 F.2d at 331-32 (internal citations omitted).

Only the third exception even arguably applies to this case. "An award is ambiguous if it is susceptible to more than one interpretation or fails to address a contingency that later arises." Accuride Erie L.P. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local Union, No. 05-169, 2009 WL 426661, at *3 (W.D. Pa. Feb. 20, 2009). The panel's decision in this case was not ambiguous. It clearly declined to award attorney's fees in favor of the Kulchinskys. Because "arbitrators have no obligation to explain their reasons for an award or even to write an opinion unless the contract so requires," Exxon Shipping Co., 73 F.3d at 1297, and the panel's decision was not ambiguous, I will decline to remand the award to the panel for further explanation.

V.      Ameriprise's Motion To Confirm the Award Will Be Granted

Ameriprise moves to confirm the arbitration award. The Federal Arbitration Act provides that "unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§ 10-11]," the Court "must grant" a motion to confirm the award. 9 U.S.C. § 9. Because there is no basis upon which to vacate, modify or correct the award, I will grant Ameriprise's motion to confirm it.

An appropriate Order follows.